The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the Iowa STATE BAR ASSOCIATION, Appellee,

v.

John E. BEHNKE, Appellant.

No. 61443.

Supreme Court of Iowa.

March 21, 1979.

Rehearing Denied April 19, 1979.

George Lindeman of Lindeman & Yagla, Waterloo, for appellant.

Hedo M. Zacherle, Lee H. Gaudineer, Jr., and Roger J. Kuhle, Des Moines, for appellee.

REYNOLDSON, Chief Justice.

February 22, 1977, the Committee on Professional Ethics and Conduct of the Iowa State Bar Association (complainant) filed an eight-count complaint against Parkersburg attorney John E. Behnke (respondent) with this court's Grievance Commission (Commission). Counts I and II charged respondent with drafting certain wills naming himself as contingent beneficiary and executor in violation of specified provisions of the Iowa Code of Professional Responsibility for Lawyers.

The third division of the Commission received evidence and testimony in the summer of 1977. The Commission found complainant's allegations in counts I and II were "sustained by convincing preponderance of the evidence," concluded respondent violated Ethical Consideration 5–5 of the Iowa Code of Professional Responsibility for Lawyers, and recommended a three-

year suspension "if not complete disbarment." One division member separately recommended disbarment.

Respondent appealed and raises several issues which are treated in the divisions which follow. We hold respondent's license to practice law shall be suspended and shall not be reinstated for at least three years.

I. *Can the violation of an ethical consideration provide a basis for discipline?*

Complainant charged that in drafting wills for Eilert and Nellie Wumkes respondent violated the following ethical considerations of the Iowa Code of Professional Responsibility for Lawyers as it was worded prior to December 16, 1977:

> EC 5–5 A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or overreached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. *Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.*
>
> EC 5–6 A lawyer should not consciously influence a client to name him as executor, trustee, or lawyer in an instrument. In those cases where a client wishes to name his lawyer as such, care should be taken by the lawyer to avoid even the appearance of impropriety.

(Emphasis added.) On December 16, 1977, EC 5–5 was amended to transfer the substance of the emphasized sentence to new disciplinary rule 5–101(B):

> A lawyer or the lawyer's partners or associates shall not prepare an instrument in which a client desires to name the lawyer beneficially unless the lawyer is the spouse of, or is the son in law or daughter in law of, or is otherwise relat-

ed by consanguinity or affinity, within the third degree, to the client.

The Commission found respondent violated only EC 5–5 (drafting instruments granting him beneficial interest) as charged in counts I and II.

Respondent contends violation of an ethical consideration does not provide a basis for disciplinary action. We recently resolved this issue:

> All lawyers practicing before this court are bound by the canons . . . .. They are not free to view them merely as aspirational. A canon cannot be ignored by an attorney on the claim he believes it conflicts with his view of a constitutionally protected right. The purpose of the canons as explained by the ethical considerations, disciplinary rules and adjudicated decisions is to show him the professionally acceptable route through questions or doubts he may have regarding such conflicts.

*In re Frerichs*, 238 N.W.2d 764, 769 (Iowa 1976). Attorneys have been disciplined for ethical consideration violations in *Frerichs* and at least five other cases. *Committee on Professional Ethics & Conduct v. Wilson*, 270 N.W.2d 613 (Iowa 1978); *Committee on Professional Ethics & Conduct v. Baker*, 269 N.W.2d 463 (Iowa 1978); *Committee on Professional Ethics & Conduct v. Sloan*, 262 N.W.2d 262 (Iowa 1978); *Committee on Professional Ethics & Conduct v. Toomey*, 253 N.W.2d 573 (Iowa 1977); *Committee on Professional Ethics & Conduct v. Bromwell*, 221 N.W.2d 777 (Iowa 1974).

Although in these decisions lawyers were not disciplined for ethical consideration violations alone, we find nothing to support respondent's assertion we should draw such a distinction. Nor are we willing to accept respondent's suggestion we re-examine *Frerichs*. We hold violation of an ethical consideration, standing alone, will support disciplinary action.

II. *Can respondent raise legal issues not presented to the Commission?*

Respondent has raised issues which apparently were not presented to the Commis-

sion, including the issue just resolved. Complainant has made no objection. Nonetheless, the question arises whether we now should consider them.

In *Committee on Professional Ethics & Conduct v. Roberts*, 246 N.W.2d 259 (Iowa 1976), we declined to reach a contention that Roberts was not provided with timely notice of his hearing before the Commission "because it was not urged before the commission." *Id.* at 260. That complaint related to procedural due process. Had Roberts complained to the Commission the alleged defect could have been corrected.

■ Most of respondent's complaints in this appeal are different. He alleges he should prevail because Commission's report was not timely filed with this court, a defect which, after the event, is beyond correction. He contends EC 5–5 is unconstitutionally vague. Constitutional issues lie exclusively within the judiciary's domain. *Salsbury Laboratories v. DEQ*, 276 N.W.2d 830, 836 (Iowa 1979).

Commission rule 13 provides the Commission shall hold a hearing and issue a ruling "upon any preliminary motion or application filed in connection with a complaint." *Supreme Court Order of June 23, 1975, reprinted in Iowa Court Rules*, Sup.Ct.R., at 25d (1979). Our rule 118.9 requires the Commission's report to include "conclusions of law" as well as findings of fact and recommendations.

■ While these provisions indicate questions of law ordinarily should be preserved by raising them before the Commission, we are not persuaded traditional concepts of error preservation must always be imposed in attorney disciplinary proceedings. To do so would be to characterize the procedure as just an unusual lawsuit. It is not:

"A disciplinary proceeding is basically an inquiry into the fitness of a member of the bar, in the light of his [or her] conduct, to continue in the practice of the law." This proceeding is not criminal, but is special, civil in nature, and has been described as like an investigation by the court into the conduct of its officers.

. . . .

The matter is triable de novo in this court . . . .

*Committee on Professional Ethics & Conduct v. Kraschel*, 260 Iowa 187, 193–94, 148 N.W.2d 621, 625 (1967) (citations omitted). *See Mildner v. Gulotta*, 405 F.Supp. 182, 191–92 (E.D.N.Y.1975), *aff'd mem.*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976); *In re Echeles*, 430 F.2d 347, 349–50 (7th Cir. 1970).

■ A distinction must be drawn between basic concepts of ethics policy and relatively routine issues of procedure or evidence. Where it is apparent that raising the legal issue before the Commission would not have changed the record made there, nor the course of the proceeding before that body, we will not automatically apply the error preservation principles closely linked to the adversary nature of a lawsuit. We have the ultimate responsibility to determine respondent's fitness to practice law. We would not always discharge that responsibility if we invariably rejected either party's law issues on error preservation grounds.

### III. *Are Iowa Sup.Ct.R. 118 filing and appeal periods mandatory and jurisdictional?*

Rule 118.9 provides that "[t]he disposition or report of the commission shall be made or filed with this court within thirty days of the date set for the filing of the last responsive brief and argument."

In this case all briefs were to be filed October 15, 1977. Respondent's brief was filed November 1. The Commission's report was dated November 28. Respondent's first appeal was filed January 6, 1978. The report was not filed with this court until February 21, 1978.

Complainant concedes the Commission was very late in filing its report with this court. It offers no excuse or explanation. The Commission did not notify this court and the parties of its inability to file the report on time, a requirement of rule 118.9.

Although the report was dated within thirty days from the date respondent's brief was actually filed, through some omission it was not filed with this court for almost three months.

Although rule 118.9 employs the word "shall," we are satisfied the mandatory-directory distinction explained in *Taylor v. Department of Transportation*, 260 N.W.2d 521, 522–24 (Iowa 1977), is applicable. The thirty-day filing requirement "is not essential to accomplishing the principal purpose of [our ethics rule] but is designed to assure order and promptness in the proceeding." *Id.* at 523. *Accord, Caldwell v. State Bar*, 13 Cal.3d 488, 496, 531 P.2d 785, 791, 119 Cal.Rptr. 217, 223 (1975); *Maryland State Bar Association, Inc. v. Frank*, 272 Md. 528, 532–34, 325 A.2d 718, 720–21 (1974).

Violation of a directory obligation ordinarily does not invalidate subsequent proceedings unless prejudice is shown. *Taylor*, 260 N.W.2d at 523. Respondent does not attempt to show prejudice. He claims such showing is unnecessary because an attorney disciplinary proceeding is quasi-criminal in nature, citing *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). In *Ruffalo* five members of the court said such proceedings "are adversary proceedings of a quasi-criminal nature." *Id.* at 551, 88 S.Ct. at 1226, 20 L.Ed.2d at 122. The language was used in the context of a procedural due process issue.

Although some courts have used the *Ruffalo* language without comment, *see Charlton v. FTC*, 543 F.2d 903, 906 & nn.21 & 22 (D.C.Cir. 1976), other courts have declined to pigeonhole disciplinary proceedings. *See In re Daley*, 549 F.2d 469, 474–77 & n.6 (7th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *In re Abrams*, 521 F.2d 1094, 1099–100 (3d Cir. 1975), *cert. denied*, 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975); *Polk v. State Bar*, 480 F.2d 998, 1001–02 (5th Cir. 1973); *Echeles*, 430 F.2d at 349–50; *Mildner v. Gulotta*, 405 F.Supp. at 191; *In re Bogart*, 386 F.Supp. 126, 131 (S.D.N.Y.1974).

We believe the relevant teaching of *Ruffalo* is not a label for disciplinary proceedings but a recognition that the potentially serious consequences for the attorney invoke substantial procedural due process protections. There is nothing in the fourteenth amendment or interpretive case law which requires the thirty-day filing requirement to be construed as mandatory.

The same reasoning applies to a question we raise: timeliness of respondent's appeal. Iowa Sup.Ct.R. 118.10 and 118.11 give respondent twenty days after Commission's report is filed to file "a statement of exceptions to such report . . . and to give notice of appeal." Respondent's first appeal notice was not accompanied by a statement of exceptions. His second notice of appeal incorporated a statement of exceptions but was filed March 29, 1978, sixteen days late.

Iowa R.App.P. 5, which provides that appeals from district court "must be taken within, and not after, thirty days" of final judgment, has been construed as mandatory and jurisdictional. *See, e. g., Lundberg v. Lundberg*, 169 N.W.2d 815, 817 (Iowa 1969). The language of rule 118.11 is different.

In any event the Commission's decision is not a final adjudication of the case. Whether or not either party appeals, a recommendation of discipline is reported to this court where it stands "for final disposition." Rule 118.9. *See also* rule 118.10; *Committee on Professional Ethics and Conduct v. Crary*, 245 N.W.2d 298, 303 (Iowa 1976).

■ We find the relevant language of rules 118.9 and .10 to be directory only. We have jurisdiction to reach the merits in this disciplinary proceeding.

By so holding we do not condone delays in processing disciplinary proceedings. The attorney and the public both deserve speedy disposition of such charges.

IV. *Is the wording of old EC 5–5 so vague and indefinite as to deprive respondent of due process?*

Although respondent's brief articulates the issue substantially in this form, his arguments, both oral and written, display a basic ambivalence.

He asserts he was deprived of due process because counts I and II of the complaint were vague. We cannot agree. They respectively contained thirteen and eleven extensive paragraphs of factual recital detailing respondent's alleged activities. Each count specified the ethical considerations and disciplinary rules he allegedly violated. The complaint was more detailed than would have been required even for a criminal information or indictment.

■ Due process in a criminal case requires only that the accused be informed of the nature and cause of the accusation. *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562, 572 (1975). This complaint in a disciplinary proceeding clearly passes constitutional muster. We also note that the Commission could order any such defect corrected if given the opportunity. Respondent should have made this argument before the Commission.

■ Respondent also asserts old EC 5–5 was so vague it violated his due process rights under the fourteenth amendment to the United States Constitution, and article I, section 9 of the Iowa Constitution. Again, we cannot agree.

■ In this contention respondent assumes a heavy burden in overcoming the presumption of constitutionality and in negating every reasonable interpretation upon which the rule might be sustained. *Millsap v. Cedar Rapids Civil Service Commission*, 249 N.W.2d 679, 684 (Iowa 1977); *see Board of Supervisors v. Department of Revenue*, 263 N.W.2d 227, 235 (Iowa 1977); *Chicago Title Insurance Co. v. Huff*, 256 N.W.2d 17, 25 (Iowa 1977).

■ The purpose of the canons, as explained by the ethical considerations, disciplinary rules, and adjudicated decisions, is to show lawyers the professionally acceptable route through the questions or doubts which may arise in their professional activities. *See Frerichs*, 238 N.W.2d at 769. But it is obvious the canons cannot contain enough "thou shalt nots" to identify every ethical temptation a lawyer will encounter in his or her practice. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367, 371 (1952) ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."). Members of the bar can be assumed to know that certain kinds of conduct, generally condemned by responsible persons, will be grounds for disciplinary action. *See Ruffalo*, 390 U.S. at 554–55, 88 S.Ct. at 1228, 20 L.Ed.2d at 124–25 (White, J., concurring). It is significant, we think, that respondent has cited no decision in which any part of the canons has ever been found to be unconstitutionally vague or indefinite.

Courts have generally recognized that in certain contexts where the target of regulation is confined and the need for leeway in regulation is great, vagueness is difficult to prove. *See, e. g., Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (military justice code); *Boyce*, 342 U.S. at 337, 72 S.Ct. at 329, 96 L.Ed. at 367 (ICC regulation); *Millsap*, 249 N.W.2d at 684–86 (civil service statute authorizing discharge for "misconduct").

The Iowa Code of Professional Responsibility for Lawyers regulates lawyers' conduct only. The need for flexibility in governing their conduct is well established. "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572, 588 (1975).

Old EC 5–5 was not unconstitutionally vague. It plainly provided a lawyer should not draft instruments naming him or her beneficially except in exceptional circumstances. It is no exceptional circumstance when the client desires the attorney to be so named: Under the language of the relevant provision that is assumed. What might constitute an exceptional circumstance need not be enumerated in the canon.

We find the constitutional issues raised by respondent to be without merit.

*V. Is the drafting of a will in which the drafting attorney is named as a contingent beneficiary unethical conduct or a violation of EC 5-5?*

Respondent on this issue ignores EC 5-5 and asserts, "The general view prior to the adoption of the present DR 5-101(B) was that although it was not a preferable practice the drawing of a will for a client in which the attorney is named as a beneficiary was not prohibited." The cases do not support this statement. *In re Krotenberg,* 111 Ariz. 251, 527 P.2d 510 (1974); *Columbus Bar Association v. Ramey,* 32 Ohio St.2d 91, 98, 290 N.E.2d 831, 835 (1972); *In re Gonyo,* 73 Wis.2d 624, 245 N.W.2d 893 (1976). *See generally* Annot. 98 A.L.R.2d 1234 (1964).

The language in the opinions relied on by respondent is antiquated. None of the authorities respondent cites were involved with a rule like EC 5-5. The bench and bar are increasingly sensitive to the appearance of impropriety inherent in these situations. Ethical consideration 5-5 as it appeared at the time of these events was fashioned to steer lawyers away from such danger areas.

■ A violation of EC 5-5—part and parcel of our ethical code—would be unethical conduct. Defendant does not dispute he was beneficially named in the will, even though he was a contingent beneficiary.

*VI. Did complainant prove a violation of EC 5-5 by a convincing preponderance of the evidence?*

■ With the above legal standard in mind we examine the facts. Respondent admits he drafted wills for Eilert and Nellie Wumkes in which he was beneficially named. Thus we must necessarily determine whether there were "exceptional circumstances" which permitted such conduct. Complainant carries the burden of showing the violation "by a convincing preponderance of the evidence." *Kraschel,* 260 Iowa at 194, 148 N.W.2d at 625. At the outset we note, contrary to respondent's contentions, that it is not necessary for the purposes of this proceeding for complainant to show fraud, deceit, undue influence or overreaching.

Respondent, age fifty-four, was admitted to the bar in 1954. He did not practice law until 1962 when he took over his deceased father's practice. He soon met Eilert and Nellie Wumkes, brother and sister, unmarried, aged, and very wealthy. They had been his father's clients and friends.

In 1963 respondent drafted wills for Eilert and Nellie in which each left all property to the other and, at their request according to respondent, named him executor.

There is physical and testimonial evidence respondent later prepared a codicil for Nellie which made him and his two minor daughters contingent beneficiaries. There is uncontradicted evidence Eilert and Nellie liked respondent and the daughters. There is also evidence Nellie was distressed by the bequest to respondent in this unexecuted codicil.

In 1969, respondent received $7500 from Eilert and Nellie, represented by unsecured promissory notes which he prepared. These carried no due date and only five percent interest. Respondent testified these funds were used to relocate his office and were intended initially to be a gift. He says the notes were drafted at his suggestion but he admits he did not advise them to consult other counsel prior to this transaction.

April 7, 1972, Eilert and Nellie executed wills prepared by Waterloo attorney W. Louis Beecher. Beecher was the family lawyer for Kenneth Dalziel, whose son James had worked on Nellie's farms. Kenneth testified Nellie wanted a different lawyer because she was dissatisfied with respondent's services. Beecher's secretary testified Nellie said she didn't trust respondent and "didn't want him handling their affairs at all." Nellie also asked Beecher to assist in collecting respondent's promissory notes.

In these April wills each testator gave the other a life estate with the remainder to various charities and persons, including Kenneth and his son. Kenneth was co-executor. Neither respondent nor Beecher was mentioned in the will.

November, 1972, Eilert and Nellie executed two more wills prepared by Beecher. Under these wills Kenneth's bequest was eliminated but he remained as co-executor, now with his son. In the same month Beecher sent respondent a collection letter on the notes. Respondent made no response.

June, 1973, Eilert and Nellie executed wills prepared by Parkersburg attorney Culver E. Klinkenborg. The change in attorneys appears to have been motivated by the distance to Waterloo, and, according to Klinkenborg, the sophisticated estate planning urged by Beecher. Klinkenborg testified the testators believed respondent had drafted wills in which, contrary to their wishes, he was a beneficiary.

These June wills did not contain the reciprocal bequests. Each testator left his or her property to numerous friends and charities. Klinkenborg testified this change was effected to keep part of the property from being taxed in two estates. Klinkenborg was named as co-executor. Respondent's name was not mentioned in either will. Klinkenborg drafted first codicils to these wills which were executed in September, 1973.

The latter also wrote respondent three times as Wumkeses' request, demanding payment of the notes. Although the first letter stated, "Nellie and Eilert want all future contacts of whatever nature to be made through me . . .," respondent ultimately paid the Wumkeses directly.

Respondent testified he still performed legal services for Eilert and Nellie throughout this period and considered himself their lawyer, despite the other wills and loss of their tax work. Their tax returns for 1972 were prepared by Beecher in 1973. Klinkenborg prepared subsequent tax returns.

November 15, 1974, Eilert and Nellie executed wills prepared by respondent at Nellie's request. These wills merely left everything to the survivor. Respondent was not mentioned.

January 31, 1975, Eilert and Nellie executed two more wills drafted by respondent. There is credible evidence in the record that he visited them at their request, prepared the wills, delivered rough drafts, and returned in several days to supervise execution of the documents. These wills bequeathed testator's property to the survivor with contingent bequests to various persons, including respondent, who was bequeathed real estate worth approximately $320,000.

Soon after execution of these wills Wumkeses sought to have them revoked. Nellie showed Kenneth Dalziel the wills and said, "That isn't what we want in our wills." The latter took them to Klinkenborg, who prepared second codicils reaffirming the June, 1973, wills and revoking all others. These codicils were executed February 14, 1975, just two weeks after the execution of the wills drafted by respondent. In early March, 1975, Klinkenborg prepared and Eilert and Nellie executed new wills which were similar in testamentary design to the June, 1973, wills.

In April, 1975, Eilert apparently suffered a stroke and was hospitalized. On June 1 he was transferred to a nursing home. He was eighty-seven years old and in poor health, both mentally and physically.

On June 11, 1975, respondent obtained Eilert's signature on a will identical to the one prepared in January. According to respondent, Nellie could not remember whether any intervening wills had been executed since January and asked him to prepare another for Eilert to sign. Respondent took Nellie to the nursing home, left the will with Eilert and returned some time later. When nursing home employees refused to witness the will, respondent served as one of the witnesses. He testified he knew this would forfeit his contingent bequest. See § 633.281, The Code. The record also discloses it was apparent Nellie probably was going to survive Eilert and would be beneficiary of all his property under the will respondent drafted.

Although respondent testified Eilert was awake, alert and aware of what he was signing, the overwhelming weight of evidence is to the contrary.

After this incident Eilert and Nellie, with Klinkenborg's assistance, filed voluntary petitions for appointment of Kenneth as conservator.

Eilert died October 16, 1975. With Klinkenborg's assistance Nellie offered the March, 1975, will for probate. Respondent petitioned to set aside the probate of this will. Nellie was named as joining that petition.

Nellie, age eighty-five, was placed in a nursing home in October, 1975. In February, 1976, respondent visited her and obtained her signature on a petition to terminate her conservatorship. This petition was denied in May, 1976.

From the above it is obvious respondent, among other things, repeatedly prepared wills which named him beneficially. But he suggests "exceptional circumstances"—a paucity of heirs and the close relationship between clients and attorney—renders EC 5–5 inapplicable.

While the Wumkeses may not have wanted to leave property to their nephews and nieces, there were many potential beneficiaries. The Commission found, "[T]he record is filled with attorneys and would-be beneficiaries making a trail to the Wumkeses household bestowing gifts and flattery . . . ." Eilert and Nellie frequently evidenced a desire to make charitable bequests as well. There was no basis for reasoning the property was in danger of passing to strangers.

There is also no reason to question that from time to time Eilert and Nellie wanted to leave respondent property.

We cannot find anything exceptional in the above circumstances. Lawyers involved in probate and estate planning often observe the syndrome evidenced here: the frustration and vacillation of wealthy and childless old persons without close family ties. The resulting vulnerability only enhances the EC 5–5 requirement. Another lawyer selected by the client should draft the instrument which beneficially names the client's lawyer. We find respondent violated EC 5–5.

We have examined the record in light of the other unrelated charges contained in the complaint, because in our de novo review we are permitted to reach a different result from the Commission even though complainant did not appeal. *See Crary,* 245 N.W.2d at 303. While at least two other charges present close questions, we find the alleged ethical violations are not supported by the required quantum of proof.

We hold that respondent's license to practice law shall be suspended indefinitely and shall not be reinstated for a period of three years from date of this decision.

Respondent's suspension shall apply to and include all facets of the ordinary law practice, including but not limited to those specific services itemized in Iowa Sup.Ct.R. 118.12. He shall take prompt steps to comply with new Iowa Sup.Ct.R. 118.18, adopted by order of this court dated January 15, 1979, relating to notification of clients and counsel.

LICENSE SUSPENDED.