The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Appellee,

v.

John D. RANDALL, Appellant.

No. 63172.

Supreme Court of Iowa.

Nov. 14, 1979.

John L. Butler, of Lundy, Butler & Lundy, Eldora, for appellant.

Lee H. Gaudineer, Jr., Paul A. Zoss, and Hedo M. Zacherle, Des Moines, for appellee.

HARRIS, Justice.

John D. Randall, the respondent attorney, was charged in a two-count complaint with unprofessional conduct. One count arose from Randall's status as both draftsman and sole beneficiary of a client's will. The other count primarily concerned Randall's representation of the same client in litigation in which there was a conflict between the client's and Randall's interests. Finding violation on both counts, our commission recommended disbarment. On our de novo review we adopt the recommendation.

Randall met Lovell Myers sometime in the early 1940s. In 1943 he represented Myers in his divorce. In 1946 Randall and Myers entered a joint venture for the purchase of farmland in Linn County. The respondent arranged financing for Myers' farming operations. In 1952 the operations were incorporated as Myers Farms, Inc. and Myers and the respondent each received 50 percent of the stock. The corporation did not succeed to all their business activities, however, so the joint venture continued to exist. Myers continued to manage the farms while Randall attended to the financial affairs of the corporation. The attorney-client relationship continued as well. An associate of Randall represented Myers in an audit by the Internal Revenue Service and the Randall office regularly prepared Myers' and the corporation's income tax returns, attended to real estate instruments, and examined abstracts of title.

Prompted by an audit, the joint venture in 1967 transferred its land to the corporation. The corporation prospered. By the time of Myers' death in 1976 the corporate net worth amounted to about four and one-quarter million dollars.

Marie Jensen, Myers' only child, was born in 1930. After her parents' divorce she

lived with her mother but saw Myers frequently. In 1949 she married Warren Jensen. Their two sons were born in 1950 and 1953. The elder was named for Myers. In 1950 Marie and Warren moved on one of the corporation farms but left shortly due to the farmhouse's lack of heat and a disagreement over livestock methods. Nonetheless Myers helped Marie and Warren move to another farm. In 1974 Marie, Warren, and one of their sons moved to Cedar Rapids to assume management of the corporate farms.

Except for these events the relationship between Myers and his daughter is disputed. On the one hand the complainant notes a number of things. There was cooperation between Warren and Myers. Myers acted amicably toward Warren and doted on his grandsons. Myers suffered from diabetes, heart trouble, and cancer and was hospitalized in 1975, after which both Marie and one of her daughters-in-law attended him during convalescence. In 1970 Myers told Marie, without mentioning a will, that when he disposed of his property, she and Sue Jameson (Randall's daughter) would each have a farm plus half interest in Myers Farms, Inc.

On the other hand Randall asserts Myers was hostile toward his daughter. Some evidence offered by Randall must be disregarded as not probative. Yet, James W. Grummer, Myers' business acquaintance, testified Myers told him in August 1973 that he and Randall had reciprocal wills. (There is nothing in the record to indicate Randall ever executed a will bequeathing anything to Myers.) Randall stated that in 1953 he prepared another will for Myers, also bequeathing the property to himself. It is not shown whether the 1953 will was ever executed.

Richard Nazette, a Cedar Rapids attorney who represented Myers in the Morningstar lawsuit (to be discussed later), testified that Myers was estranged from his daughter during the time she lived with Myers' former wife. This was from 1946 to 1956. Nazette also testified he overheard a 1975 conversation between Myers and Randall about "strained relations" between Myers and Marie.

Randall's secretary also testified Myers remarked, after the 1953 will was prepared, "she" (presumably his daughter) never cared about him. Randall asserted he dissuaded Myers from disinheriting Marie completely in the 1953 will. He also testified Myers and Marie continued in conflict from the time the joint venture was formed until Myers' death. This was the reason, according to Randall, Myers intended to leave all his property to him.

Gilbert Morningstar first worked for Myers in 1938 and resumed as farm worker and foreman from 1946 until the end of 1974. During these years Morningstar and Myers worked together daily and maintained a close personal friendship. Morningstar once loaned $50,000 to Myers Farms, Inc.

In 1956 Morningstar bought land known as the Hess eighty. (Randall testified that Morningstar acted only as "straw man" in this transaction for the Randall-Myers joint venture. But we find no support for such a claim.) Morningstar later bought land known as the Zach-120 acre tract. Morningstar's lands were farmed by Myers Farms, Inc. on a crop-share basis.

During February of 1973 Evelyn Morningstar, Gilbert's wife, visited the Linn County courthouse to learn the legal descriptions of properties she and her husband owned. This was preparatory to making out her will. She discovered a record of a warranty deed to the Hess eighty from her and her husband to Myers Farms, Inc. She also found that the same 80-acre tract was subsequently mortgaged for $90,000. Of course she immediately reported this to her husband.

Morningstar called Randall at his office and told him that Myers wanted to see him there at eight o'clock the following morning. Early the next morning Morningstar told Myers that Randall wanted to see him (Myers) in his office.

Morningstar then confronted the two at Randall's office. He angrily charged that

his and his wife's signatures had been forged on the deed. After threatening that someone was going to jail he left. Myers followed him to the hallway outside and admitted to Morningstar that he had forged both signatures. He begged Morningstar to return to the office so that the matter could be discussed. Morningstar refused to do so.

Myers then returned to Randall's office and told him what he had done. Myers was upset and weeping. As a result Randall and Myers, on behalf of the corporation, quit claimed the Hess eighty to the Morningstars. Randall testified that Myers assured him that he would lose nothing by joining in the deed. Randall gave as two reasons for signing: his desire to save Myers from Morningstar's threat of jail and to protect his own associate who had notarized the forged deed in the absence of its signers.

About the time of this incident Marie received a visit from her father. He was very upset and said that Morningstar was no longer to help him farm and that he wanted Marie and Warren to come to Cedar Rapids to help. He did not tell them why. Later Marie, Warren, and their two sons met with Randall and Myers. Randall did all the talking. He told them that Morningstar was no longer to work on the farms and that Warren and his two sons should come to Cedar Rapids to take over. But a short time after this meeting, Myers wrote that things were to continue as they were and that she and Warren need not come.

Instead, upon Myers' assurance that the mortgage would be satisfied, Morningstar agreed to remain at work for the corporation. The mortgage nevertheless remained a lien for several months. In 1974 Morningstar resigned and brought suit. *See Morningstar v. Myers*, 255 N.W.2d 159 (Iowa 1977).

On March 14, 1973, Myers came to Randall's office and executed a will which Randall had drafted earlier the same day. By the will Myers left all his property to Randall. Randall was named executor. Randall admits that he at no time advised Myers to seek independent counsel in the matter. After it was executed the will was left with Randall. Contrary to the usual procedure in the office no copy of the will was placed in office files; instead the original was placed in Randall's private drawer. Incredibly, Randall testified he then forgot about it.

Shortly after Myers died in February 1976 Marie and Warren visited Randall on corporation business. Randall asked if they knew of any will by Myers and they answered that they did not. Randall denied possession of any such will. Marie learned of her father's will when Morningstar obtained a copy from the clerk of court and delivered it to her.

We do not believe Randall's testimony that he forgot about the matter. We find he was not truthful with Marie when he denied possession of the will.

Marie brought suit to set aside Myers' will. By way of reply Randall filed an action for malicious prosecution and abuse of process. He also filed a claim in the estate for himself and for the corporation concerning the Hess eighty. After protracted maneuverings the matter was settled. Randall paid Marie $700,000 and conveyed clear title to a corporate farm. Randall also assumed liability as sole devisee for all taxes and costs of administration. The value of this settlement was about one and one-half million dollars.

When Morningstar brought suit Randall entered an appearance and filed motions for Myers. He also initiated an interlocutory appeal to this court. At first Myers refused to be represented by any attorney. Finally at Randall's suggestion Myers retained Richard Nazette who appeared as his attorney in the appeal to us. Randall did, nevertheless, remain attorney for the corporation.

Randall admits that at the time of Morningstar's suit he had some anxieties about whether Myers was treating him fairly. But he stated in these proceedings that these feelings never amounted to a suspicion until 1975 when he read Myers' deposi-

tion. He concedes from the time he read the deposition a conflict of interest did arise.

When questioned in a deposition taken in the Morningstar suit about delivering the quit claim deed to the Morningstars Randall testified:

Q. Did they appear to be upset, the Morningstars? A. Well I don't know. I was pretty upset myself, and I don't know that I particularly paid any attention, because by that time I thought that the whole deal had been connived, very frankly. I don't know.

Q. In what respect? A. Well, between Myers and Morningstar. The whole picture was one to me absolutely shocking. I mean—and the fact that there was no opportunity given to discuss and find out what the situation was, I mean, to come in with the very strange way in which it was set up and then to come in with threats. The whole thing looked to me like it was—and I didn't know whether it was between Myers and Morningstar because I didn't know just exactly—how close or just what they were trying to do.

   .    .    .    .    .

A. Probably was entirely wrong, but I mean, by that time that was sort of seeping through to me. And I didn't pay any attention to whether they were upset or not. I was.

   .    .    .    .    .

A. I had a strange sensation when this thing—this plan or scheme or arrangement on February 17, 1973. I probably had unworthy thoughts, and I still have a strange feeling about the whole picture as far as I'm concerned.

   .    .    .    .    .

Q. But did you, on February 17, 1973, harbor the feeling that Lovell Myers was cheating you in some way? A. Well, very frankly, after Lovell had went and insisted that I join the quit claim deed to keep him out of jail, I thought it was a very strange situation. In fact, I at one time or another told him that I felt it was

a very strange situation, because I thought that he was smart enough so that he wouldn't admit a forgery. In other words, it looked too pat to me. It looked as though it was a deal that had been cooked up between the two of them. That was what I concluded afterwards, at the time I was so shocked I didn't have any thinking about it. But then afterwards I thought, of all the pat things to take somebody, this was one of the best.

   .    .    .    .    .

A. I thought it was all a setup deal. I mean, including the time when Morningstar had thrown across the table out at his house a round trip ticket to Hawaii that we had paid for and that I had known nothing about. And I said to Lovell, I said, "How many other things that I don't know nothing about?"

Randall's deposition clearly shows he very quickly concluded Myers and Morningstar had deceived him. The preparation of the will came in the midst of these realizations.

During the grievance commission hearing Randall attempted, without success, to explain by saying that he remained confused and uncomprehending; Myers' explanation had left him unsure that a conspiracy existed. Even less to his credit Randall took no action when he learned of Myers' forgery. He also came to suspect that Myers had made improper payments from the corporation. Again he took no action because he wanted to secure settlement.

At the hearing before the commission Randall asserted he had not so quickly suspected a conspiracy. Only by 1978, he said, did he realize Myers had left him his estate to repay for the misappropriation of funds.

We flatly reject Randall's attempted explanations and conclude that he represented the corporation in large part to protect his own interests from those of Myers.

■ I. On oral submission before us Randall suggests that the proceedings before the commission violated his right to due process under the Fourteenth Amendment of the United States Constitution. He did not present this issue before the

commission or include it in the brief he submitted to us. In *Committee on Prof. Ethics, etc. v. Behnke*, 276 N.W.2d 838, 840–41 (Iowa 1979), *appeal dismissed,* —— U.S. ——, 100 S.Ct. 27, 60 L.Ed.2d 1062 (1979), we discussed what matters can be raised for the first time in submission of a disciplinary proceeding for our review. We think Randall's due process argument should have been submitted to the commission and certainly should have been included as a point in his brief in this submission. Because he failed to do either we consider the due process argument waived.

■ II. It is complainant's burden of proof to establish the charge by a convincing preponderance of the evidence. This burden amounts to less than is required in a criminal prosecution but is greater than is required in a civil suit. *Committee on Prof. Ethics, etc. v. Bitter*, 279 N.W.2d 521, 522 (Iowa 1979). We find the complainant has easily established both counts in accordance with this standard.

■ At the time Randall drew the Myers will naming himself as beneficiary EC 5–5 provided in part: "Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client." We considered this language in *Behnke*, and held: "A violation of EC 5–5—part and parcel of our ethical code—would be unethical conduct." 276 N.W.2d at 844.

■ Randall argues that the "exceptional circumstances" language which then existed in EC 5–5, at least in part, is justification for his conduct. We find the argument is patently without merit. Under the unique relationship Myers relied especially heavily on Randall and imposed great faith and trust upon him. An attorney owes no less professional honesty to his business associates and personal friends than to a casual client. There was nothing in the facts in this case amounting to "exceptional circumstances" which would allow Randall to draft the will in his own favor. We have passed from the era in which it can be argued it is professionally acceptable for a lawyer to draw a client's will in his own favor unless undue influence can be shown. We made this clear in *Behnke*, 276 N.W.2d at 844.

III. We have said Randall's representation of both his own and Myers' corporate interests in the Morningstar suit was a conflict of interest. As such it was a violation of DRs 5–101(A) and 5–104(A) interpreting EC 5–1, 5–2, and 5–3. We discussed professional conflicts of interest in some detail in *Committee on Prof. Ethics, etc. v. Baker*, 269 N.W.2d 463, 465–66 (Iowa 1978). The conflict, even according to Randall's own testimony, was flagrant and inexcusable. In view of his suspicions about Myers and Morningstar, and his belief the two were involved in a conspiracy against him, it was outrageous misconduct for him to continue in any way to represent Myers' interests.

IV. We must then determine the appropriate action for Randall's misconduct. In doing so we note that we are stung by Randall's testimony in at least two respects. It was sham to testify that, after drawing a will bequeathing himself upwards of two million dollars and then placing the will in his own desk drawer, he forgot about it. And Randall's testimony on the crucial question of when he first began to suspect Morningstar and Myers were conspiring against him was contradictory; it shifted to meet complainant's showing of his conflict of interest. Although Randall had a clear right to defend against the charges he did not have a right to do so in a manner that was less than forthright.

There may be some question of whether Randall's convenient memory was more confused than it was corrupt. But the answer to this question does not relate to his fitness to practice law. In either event our conclusion is that his misconduct demands that he be disbarred.

LICENSE REVOKED.

All Justices concur, except McCORMICK, J., who takes no part.