**COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Appellee,**

v.

**D. Howard MALLONEE, Appellant.**

**No. 67636.**

Supreme Court of Iowa.

Nov. 24, 1982.

Warren L. Bush, Wall Lake, for appellant.

Lee H. Gaudineer and Hedo M. Zacherle, Des Moines, for appellee.

UHLENHOPP, Justice.

This appeal by an attorney from a license revocation recommendation of the grievance commission consists of four parts.

I. *Carley settlement.* Appellant D. Howard Mallonee is licensed to practice law in Iowa. In 1978 Mary A. Carley and her son Michael were in an automobile accident in which their car was struck from behind. They and Melvin L. Carley, Mrs. Carley's husband, retained Mallonee to obtain damages; Mallonee was to have one-third of the amount collected as his fee. The Carleys received $2000 from their own insurer under a medical clause in their policy. We do not think this money was to be included in computing Mallonee's fee.

Mallonee negotiated with Continental Western Insurance Company, which insured the other car, and eventually obtained a settlement of $5615.13 for Mrs. Carley and $10,000 for Michael, for a total of $15,615.13. Mrs. Carley's settlement was divided into two checks: one to her and her husband for $5000, and the other to her medical treatment provider for its bill of $615.13. Michael's settlement was divided into a check to Michael for $8686.54 and another check to his medical treatment provider for $1313.46.

Mallonee did not fully explain the facts of the settlement to the Carleys. He called in Mr. and Mrs. Carley and secured their signatures on a release and their endorsements on their check and on the medical checks. He delivered all the checks to them except Michael's check for $8686.54.

A few days later Michael came to Mallonee's office. Without explaining or disclosing the contents of the documents, Mallonee obtained Michael's signature on a release and his endorsement on the check for $8686.54. Mallonee took that check to the bank and deposited it in his own account except for $3000 which he kept out in cash. He retained the entire sum of $8686.54.

His fee of one-third of the total amount collected—$15,615.13—would be $5205.04.

Subsequently the Carleys inquired of Continental about the particulars of the settlement, and ascertained the facts. A complaint was registered with the ethics committee, which upon investigation discovered the facts we have related.

Confronted with these developments, Mallonee asserted that in the late 1960's he assisted Mrs. Carley in connection with a grand jury investigation of a manslaughter charge growing out of an accident. He contended that the sum of $3000 he deducted was payment for those services, and that the balance of $5686.54 from Michael's check was approximately the one-third fee for the present services.

During the years since the grand jury investigation Mallonee never billed Mrs. Carley, nor does the record show he ever entered or carried such an item on his books. The services do not appear to have been extensive. Why, in any event, Mallonee would collect Mrs. Carley's alleged bill out of Michael's check is not clear. If Mallonee really believed that Mrs. Carley owed him something for prior services, he should have explained that to her at the time of the insurance settlement and endeavored to arrive at a settlement with her of that item also.

Like the commission, however, we do not believe Mallonee's explanation. We think this money from Continental was flowing through Mallonee's office, Mallonee manipulated his clients and the papers in such a way as to skim off $8686.54 instead of the $5205.04 that he was entitled to, and he appropriated the difference of $3481.50 to his own use. We approve the commission's finding that he violated DR1–102(A)(3), (4), and (5), EC 1–5, EC 9–5, and DR9–102(A) and (B) of the Iowa Code of Professional Responsibility for Lawyers.

II. *Schmidt estate.* The central facts regarding Mallonee's handling of the Schmidt estate are as follows. An elderly former client, Adolph E. Schmidt (Schmidt) died on September 3, 1976. Schmidt had

allegedly made a joint and mutual will with his second wife, who predeceased him.

Schmidt was survived by three elderly siblings, Lydia, Willie, and Theodore. Mallonee called Willie to his office, and Willie signed a petition for appointment of himself as administrator, alleging in the petition that Schmidt died intestate. The probate court appointed Willie as administrator, and Mallonee was designated as the administrator's attorney. The assets of the estate conservatively amounted to $120,000. The principal asset was a farm of 156 acres which the inheritance tax appraisers later valued at $78,000. We note that such appraisers are not generally given to extravagant valuations.

In March 1977 the heirs of Schmidt's predeceased second spouse sued to enforce the alleged joint and mutual will. Attorney Robert E. Beebe was employed to defend the lawsuit on a contingent fee basis of one-third of the net assets of the estate if he was successful, thus protecting the three Schmidt heirs from attorney fee expense if they lost.

Early in 1978, Mallonee contacted another former client, Minetta Kroll. He interested her in buying the Schmidt farm for $78,000, showing her an appraisal in that amount. Kroll considered that Mallonee was representing her.

Mallonee got the Schmidt heirs to execute a contract to sell the farm to Kroll for $78,000, with a down payment of $8000. Kroll paid $8000 to Mallonee by check, but the check was never cashed. At no time was the farm offered at auction, bids were not obtained, and probate court proceedings to sell it were not instituted.

In October 1979 the lawsuit regarding the alleged will was settled by a payment of $30,000. In view of the settlement, Beebe's fee on an hourly basis was $3500, which was paid.

In December 1979, Mallonee obtained an assignment from Kroll of her contract to purchase the farm. He represented that he needed the assignment to clear the title; why this would be so is not apparent. The assignment stated that he would convey the farm to her if he perfected title. Mallonee had been receiving the crop share rental from the farm, purportedly for Kroll under her purchase contract. He now took entire charge of the farm and changed the rent to $700 per month cash, which he collected during approximately the following two years. He made no payments on the real estate contract.

In December 1979 Mallonee also obtained consents from Lydia and Theodore for Willie to close the estate, and receipts for distribution and waivers of notice of final hearing from all of the three Schmidt heirs.

Mallonee then set about to obtain conveyances of the farm and to make distribution. He first obtained a deed from Lydia to Willie of Lydia's one-third interest in the farm for $16,000. This amount was to constitute her full share in the estate. Who provided this $16,000 is unclear. Mallonee notarized Lydia's deed.

Lydia later questioned the transaction and consulted Attorney Michael McGrane. After checking the probate file and finding documents missing, McGrane talked directly with Mallonee, who showed him the Kroll contract. McGrane assumed it was legitimate. Mallonee also showed him an alleged accounting with remaining charges of some $55,000, and told him that Beebe's contingent fee was about $18,000 but was subject to some negotiation. McGrane concluded that this would leave about $36,000 for distribution. Mallonee did not tell McGrane that the check for the down payment of $8000 on the farm had never been deposited or that Mallonee had received the rents from the farm through the years. McGrane decided that Lydia's share would be about $12,000. She had already received $16,000, and she settled for an additional $1000 from the estate.

Mallonee next approached Willie. He told Willie that a partial distribution was to be made and agreed to pay him $16,000. The release Mallonee used, however, was a copy of the full release Lydia had given, and Willie, who now had title to two-thirds of the farm, was also to sign a deed to the farm.

Although Mallonee had notarized the deed from Lydia to Willie, he contacted Attorney Thomas R. Mohrhauser, McGrane's partner, to notarize the release and deed from Willie. Mohrhauser acted as notary, not as legal adviser, and he was unaware of his partner's previous involvement. He read the release to Willie, who then signed it, and Mohrhauser notarized it. Willie then signed the deed, and Mohrhauser notarized that instrument also. Mallonee and his wife were grantees in the deed. Why Mallonee's wife should be a grantee, if Mallonee was merely trying to clear title, is not apparent.

Mallonee then struck a snag. Theodore had received only about $3000 in distribution, and he would not sign a deed to the farm. He became suspicious and consulted Attorney Phillip S. Dandos. This resulted in the discharge of Mallonee as attorney for the administrator. Legal proceedings have been instituted in an attempt to recover the assets of the estate.

Affairs in this estate are in a nearly hopeless tangle. The Schmidts have been misused. Mallonee tried to serve three masters, the Schmidts, Kroll, and himself. He is responsible for the situation, either as the result of incompetence or duplicity. We agree with the commission's finding that Mallonee's conduct of affairs in this estate violated DR1–102(A)(1), (3), (4), and (5), EC 1–5, EC 5–3, and sections 610.15 and 610.-24(3) and (4) of the Iowa Code of 1977 and 1979.

III. *Chedester will.* Mallonee drafted a will for James D. Chedester, who was suffering from cancer. In the will Mallonee was bequeathed ten percent of Chedester's estate. Chedester did not have independent advice.

Mallonee claimed that the bequest was for past services, but he had no record of them and had never billed Chedester for them. He also claimed that he was unaware of the "new" rule prohibiting an attorney from naming himself as beneficiary.

Two heirs contested this clause in the will, and Mallonee filed a disclaimer. He did not do so, however, until a year and a half after the contest had been filed and interrogatories had been propounded to him and his deposition had been taken.

We approve the commission's finding that Mallonee violated EC 5–5.

IV. *Trust account.* Mallonee conceded that he maintained only his personal bank account, and no separate account for trust funds. He contended that he did not handle clients' funds, but with a practice as active as his, this does not appear possible.

We approve the commission's finding that Mallonee violated DR 9–102(A) and (B).

The record demonstrates that Mallonee does not possess the basic character which is essential in an attorney. *Committee on Professional Ethics and Conduct v. Randall,* 285 N.W.2d 161 (Iowa 1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Committee on Professional Ethics and Conduct v. Baker,* 269 N.W.2d 463 (Iowa 1978); *Committee on Professional Ethics and Conduct v. Crary,* 245 N.W.2d 298 (Iowa 1976); *In re Boyer,* 231 Iowa 597, 1 N.W.2d 707 (1942). The commission's recommendation of revocation of Mallonee's license is adopted.

LICENSE REVOKED.