STATE, Plaintiff, v. COLLENTINE, Defendant.

*No. State 83. Argued May 9, 1968.—Decided June 4, 1968.*
(Also reported in 159 N. W. 2d 50.)

PER CURIAM. The complaint in this proceeding was made and filed pursuant to sec. 256.28 (8), Stats. In substance it alleges that the defendant, John R. Collentine, was the attorney and conservator for Jane S. Skidmore and that on the 2d of April, 1964, he drafted a will for Jane S. Skidmore that provided, with the exception of a single bequest of personal property, that he, John R. Collentine, was to inherit the entire residue of the estate. The bare-bones allegations of the complaint are supported by the great weight and clear preponderance of the evidence.

For the plaintiff there was a brief and oral argument by *Rudolph P. Regez* of Monroe, counsel for the Board of State Bar Commissioners.

For the defendant there was a brief and oral argument by *John A. Udovc* of Milwaukee.

The Honorable ELTON J. MORRISON, whom we appointed as referee, concluded, relying on previous pronouncements of this court, that the defendant's conduct warranted discipline. He recommended a suspension from the practice of law for a period of three months. Our perusal of the evidence indicates that such discipline ought not be imposed.

It appears that Collentine is forty-five years of age. He graduated from the Marquette Law School and was admitted to the Wisconsin Bar in July of 1949. Although part of the time since his admission he was engaged in business other than the practice of law, he is presently a sole practitioner in the city of Milwaukee.

The record contains a number of letters from lawyers, judges, and businessmen who highly commend his character to us. He has no history of any previous infraction of the standards of conduct for lawyers.

The facts on which this complaint is premised are these. Jane S. Skidmore, a resident of Ozaukee county, was the beneficiary of a large annual income from two trusts. Her interest was confined only to being the recipient of income from these trusts during her lifetime. No portion of the corpus of these trusts would inure to her estate. It is undisputed that Jane S. Skidmore was a spendthrift and an alcoholic. Despite the large income of these trusts, which ranged from $30,000 to $40,000 per year, she was deeply in debt, and the bank which served as her trustee was frequently subject to garnishment.

In the fall of 1962, with the approval of the trustee, John R. Collentine was appointed as the conservator of

Jane Skidmore's estate. There was evidence that his control of her financial affairs considerably improved her financial status, but, nevertheless, at the time of her death, her liabilities exceeded her assets by more than $10,000.

Sometime during the early part of 1964 Jane Skidmore asked Collentine to prepare a will which bequeathed her mother's portrait to a public library and the residue of her estate, both real and personal, to the defendant. The defendant admits that he prepared the will and presided over its execution. In extenuation of his action, he points out that, at the time of the will's execution, he knew that the estate was insolvent and that as conditions existed then he, as residuary legatee, would receive nothing. It is also contended that he told Jane Skidmore that he did not want to make the will.

Testimony of Miriam Wigderson, a neighbor, was admitted, in which Miriam Wigderson stated that Jane Skidmore advised her that, "John wants me to get another attorney to make out my will." When Miriam Wigderson concurred in the idea that it would be well to have an attorney other than Collentine prepare the will, Jane Skidmore was quoted as saying, "What have I hired him for? I'm not going to have somebody else looking in on my things." Miriam Wigderson also testified that although Jane Skidmore "wasn't exactly a bully . . . she wanted to prove she had control over anybody she was dealing with." Miriam Wigderson and Mary Leader were present at the execution of the will. They agreed that she was rational and sober and there was testimony that, in the presence of these witnesses, Collentine, over her objections, insisted that she read the will before signing it. She read the will in the presence of these witnesses and then signed it.

Nathanael A. Lemke, who was the attorney for the trustee, stated that in the first part of 1964 Collentine called him and stated that, "Jane had asked him to draw

a will naming himself as executor and sole beneficiary." Lemke further testified:

"I laughed. I said, 'John, you know she's never had any money and there will never be any estate.' I then went on to say, 'I don't think it's advisable.' I said, 'The courts frown upon an attorney drafting a will in which the attorney is a beneficiary.' I said, 'Being an executor is fine, as long as you aren't the beneficiary.' He said, 'Well, this is what she wants.' I then recommended if that were the case, that she have some other attorney draw the will, that this would be my recommendation. John said that Jane had told him she was paying him for legal services, and didn't want to have any other attorney handle it. I said, 'Well, the decision is yours, but I would recommend having another attorney draft the will, inasmuch as the courts frown upon it.'"

On the basis of these facts the referee found that:

"The will in question was drafted exactly as the testatrix wanted it; that no undue influence was exerted by defendant except that species of undue influence which arose by virtue of the fact that the defendant, who drafted the will was the chief beneficiary under the will, that he was not related to the testatrix . . . ."

He also concluded that there was no fraud involved and that the defendant knew that Jane Skidmore "was practically insolvent at all times."

On the basis of these findings he applied the rule laid down in *State v. Horan* (1963), 21 Wis. 2d 66, 123 N. W. 2d 488, and concluded that under the *Horan Case* Collentine could not qualify to be a legal beneficiary because he was not related to the testatrix (and thus not the natural recipient of testatrix's bounty) and was in a confidential relationship. He concluded that Collentine's attempt to benefit from a will that he drafted would lead the public to question the integrity of the bar. While the *Horan Case* may be thus interpreted, it is, as Collentine's lawyer urges, subject to certain exceptions

even when the draftsman receives preferential treatment in the will. We said:

"Ordinarily a lawyer should not draw a will under circumstances which give rise to the inference of undue influence. He should draw a will in these circumstances only after fully advising his client of the effect thereof and when he is justified in believing that there is or will be independent competent evidence which rebuts the inference." (p. 75.)

Hence, we have said that a will which on its face shows that the scrivener received preferential treatment can nevertheless be justified. It is the contention of the defendant that such justification was shown here in that Collentine attempted to persuade the testatrix to get another attorney to draft the will, but she nevertheless insisted that he do it, and when he took pains to establish that it was Jane Skidmore's independent and uninfluenced volition to have such a will prepared. At the time of the execution of the will she stated that she had no near relatives and that her distant cousins "could drop dead" so far as she was concerned, indicating that there was no one who stood in the position of being the recipient of the natural bounty of Jane Skidmore's will. Collentine knew that as the situation then existed the value of the residuary estate would be zero. In *Horan* we indicated that the inference of undue influence would arise if "the bequest is more than token or modest." (p. 75.) The witnesses produced at the hearing made it clear that the choice of Collentine as a recipient of the residuary legatee was Jane Skidmore's own idea.

We conclude that there is substance to Collentine's argument that the will drafted herein is arguably within the set of circumstances which we said in *Horan* may be justified. We are satisfied that the conduct of Collentine was nevertheless within the realm of that which was intended to be prohibited in *Horan*. By posing the exception in the manner in which we did, how-

ever, it is conceivable that an attorney, relying upon the language of *Horan* and ignoring its spirit, might well have got himself into the situation in which Collentine now finds himself. Because of the arguable merits of the defendant's position, we conclude that discipline is not warranted. The subjective innocence of John R. Collentine, however, does not undo the damage he has done the legal profession.

When the will was probated, it was inevitable that the public and the press concluded that what appeared on the face of the will to be a large bequest to the lawyer-draftsman was the result of undue influence. Such a conclusion, though erroneous, was the natural consequence of Collentine's actions. The faulty judgment he exercised not only brought discredit to him, but to the entire legal profession. While technically defensible under the urged interpretation of *Horan,* we nevertheless consider that the defendant's conduct was so fraught with unfavorable consequences, which he should have foreseen, particularly in view of the warning that he had received from Attorney Lemke, that we conclude it is proper that he be admonished.

In order to prevent future misunderstandings, we conclude and establish as a rule for prospective application that a lawyer may be the scrivener of a will in which he is a beneficiary only when he stands in relationship to the testator as the natural object of the testator's bounty and where under the will he receives no more than would be received by law in the absence of a will. Under any other circumstances in which the lawyer-draftsman is a beneficiary, this court will conclude that the preparation of such a will constitutes unprofessional conduct.

When a testator wishes to have his attorney draft a will in which that attorney is entitled to anything more than he would be at law, it is the absolute duty of the attorney to refuse to act. He has the responsibility of

advising his client to consult another attorney if he wishes to pursue such a bequest. While adherence to this standard will result in occasional inconvenience to members of the bar, the problems that are inherent in the drawing of an unnatural will far outweigh such inconveniences. The inclusion of a clause making the scrivener a beneficiary is an invitation to a will contest and places in jeopardy the admission of a will that might otherwise go unquestioned, and as we pointed out in *Horan* (p. 74) we do not recognize in Wisconsin the rule of partial invalidity which would save those portions of the will not tainted with the draftsman's interest. In addition, the risk of damage to the draftsman's professional reputation, even under circumstances that are in fact innocent, is admittedly great, and the permitting of such wills which to the public would be largely unexplainable would be bound to undermine confidence in the legal profession.

In *Horan,* the door was left ajar to permit unnatural wills in certain circumstances. By this opinion, that door is closed. Under the circumstances, although the defendant is admonished, we conclude that his conduct does not warrant discipline.

Therefore, it is ordered and adjudged that the complaint herein be, and it hereby is, dismissed.