In the Matter of the Application for Disciplinary Action Against John A. Amundson, a Member of the Bar of the State of North Dakota.

**DISCIPLINARY BOARD of the Supreme Court, Petitioner,**

v.

**John A. AMUNDSON, Respondent.**

Civ. No. 9763.

Supreme Court of North Dakota.

Oct. 6, 1980.

quirements cannot be met, it serves no purpose to do so.

Gregory D. Morris, Bismarck, for Disciplinary Bd.

John A. Amundson, Bowman, pro se.

VANDE WALLE, Justice.

This is a disciplinary proceeding brought against John A. Amundson, a sole practitioner engaged in the practice of law in Bowman, North Dakota, for the past thirty years. A letter of informal complaint was filed with the Disciplinary Board of the Supreme Court on or about October 23, 1979. An investigation was conducted by Inquiry Committee West of the State Bar Association of North Dakota in accordance with the provisions of Rule 8 of the North Dakota Rules of Disciplinary Procedure. The committee recommended to the Disciplinary Board that a formal disciplinary proceeding be instituted. A summons and complaint was served on Amundson on December 21, 1979. A three-member panel was appointed and a hearing was held on February 14, 1980, at which Amundson was present. After considering the files, records, and evidence presented at that hearing, the panel recommended to the Supreme Court that Amundson be publicly reprimanded for his conduct and violations of the Code of Professional Responsibility, and that he be required to pay for the expense of the disciplinary proceedings. Amundson took exception to some, but not all, of the findings of the Disciplinary Board, and in his brief and at oral argument conceded violations of certain provisions of the Code of Professional Responsibility.

We review disciplinary proceedings against attorneys de novo on the record and the standard of proof is clear and convincing evidence. *Matter of Lovell*, 292 N.W.2d 76 (N.D.1980); *Matter of Maragos*, 285 N.W.2d 541 (N.D.1979). A summary of the facts leading to this proceeding is necessary for a discussion of the findings of the Disciplinary Board.

Amundson had a very close personal relationship with Nelius and Margit Nelson that began in his early childhood and continued to the time of their deaths. In the Nelsons' later years Amundson was involved in their personal and legal well–being. In 1963 Amundson was asked to and did prepare wills for Nelius and Margit. Nelius was satisfied with his will and signed it on October 3, 1963. Amundson and his wife, Helen, witnessed his signature to the will. Margit was not satisfied with the first draft of her will and requested Amundson to prepare another will which would include him as a beneficiary. Amundson explained to both Nelius and Margit that it was unusual for a lawyer to draw the will, to be the executor, and to be named as a beneficiary in the will. He further explained to them that the will could be drawn on plain paper, or that another lawyer could draw the will, but that if Margit wanted him to draw the will he would do so in order that people would know he was directly involved. Amundson told them he would draft the will with himself included as beneficiary because it was Margit's wish and he did not want the will drawn indirectly or covertly because the will included him as a beneficiary. The Nelsons continued to insist that Amundson draw the will and include himself as a beneficiary. The will was redrafted with Amundson included as a beneficiary and Margit executed the will on October 7, 1963. Amundson, his wife, Helen, and Bernard Thiegs witnessed the signature of Margit to the will. The will named Amundson as a beneficiary entitled to one–sixth of the entire estate provided Margit died after or nearly simultaneously with Nelius. Other beneficiaries named in the will were Mrs. Torgus Dolo, Norway, Margit's sister; Ernest and Albert Fossum; Vetle and Gilbert Torgerson, Margit's brothers; and Asta Asselstine, Ann Hyde, Leonard Larson, Doris Zehm, and Marie Kinney, children of a deceased brother and sister.

Nelius predeceased Margit. Margit died on July 2, 1973. Amundson notified the relatives of her illness and death. Amundson did not, however, inform the beneficiaries of their inclusion in Margit's will. One of the beneficiaries, Mrs. Fred Zehm, wrote Amundson on February 5, 1974, requesting a copy of the will but Amundson did not furnish her a copy of the will or otherwise respond.

The probate file for Margit's estate was opened on March 20, 1974, and a petition for proof and probate of the will was filed on September 4, 1974. On September 25, 1974, notice of hearing of the petition was filed along with a blank affidavit of service. No service of the notice was obtained nor was a hearing conducted with regard to the petition. On October 2, 1975, an application for informal probate of the will and for appointment of Amundson as personal representative was filed and an order admitting the will to probate and appointing the respondent as the personal representative was entered and letters testamentary were issued. A North Dakota estate tax return was prepared by Amundson and filed with an inventory and appraisement on October 16, 1975, establishing the gross value of the estate at $105,676.06. Estate tax was assessed in the amount of $3,957, and interest of $276.78 was also assessed. The last item filed with the county probate court was a letter dated November 20, 1975, from the office of the North Dakota State Tax Commissioner requesting clarification of the Federal taxes paid. Amundson took no further action to complete the probate of the estate. Most of the assets of the estate consisted of certificates of deposit, checking accounts, and bonds which Amundson converted to cash and deposited in an estate account with the Bank of North Dakota.

Albert Fossum, one of the beneficiaries under Margit's will, discussed the status of the estate with Amundson on two occasions.

On the second occasion Amundson gave a date of the first week in October 1979 for completion of the probate of the estate. The Bowman County judge's office also called Amundson's office to urge him to complete the probate of the estate. Amundson took no action, however.

Amundson's wife, Helen, testified as to the severe medical problems suffered by her and their son and daughter, and the deaths of other relatives and close friends during the period following Margit's death.

From its findings, the hearing panel of the Disciplinary Board drew the following conclusions and made the following recommendations:

"1. That the matter of the application for disciplinary action against John A. Amundson, a member of the Bar of the State of North Dakota, is properly before this hearing panel jurisdictionally and procedurally.

"2. The findings and conclusions of this hearing panel are supported by clear and convincing evidence.

"3. The respondent was admitted to practice as an attorney and counselor at law in the courts of the State of North Dakota on April 1, 1950.

"4. The respondent acted improperly in drafting and witnessing a will in which he was named as executor and as a beneficiary. Such conduct violates the provisions of Canon 5, DR 5–102, DR 5–103 and EC 5–6 of the Code of Professional Responsibility as adopted by the State Bar Association of the State of North Dakota and approved by the Supreme Court.

"5. The panel is cognizant of the fact that there was a close personal relationship between the respondent and Margit Nelson. That fact does not excuse the conduct involved, but has been considered by this panel in mitigation.

"6. The respondent, during the course of his representation, failed to communicate with the beneficiaries of the estate as to their status as beneficiaries and as to the status of the estate itself. Such conduct violates the provisions of Canon 6, DR 6–101(A)(3) and Canon 1, DR 1–102[A](1), (5) and (6).

"7. The respondent was negligent in representing the Margit Nelson estate by his failure to complete the estate tax returns in a timely manner, incurring interest; by his failure to distribute the assets to the beneficiaries, and by his failure to take any significant action toward completion of the estate since 1975. Such conduct violates the provisions of Canon 6, DR 6 101(A)(3); Canon 1, DR 1 102(A)(1), (5) and (6); and Canon 7, DR 7 101(A)(1), (2) and (3).

"WHEREFORE, it is the recommendation of this hearing panel of the Disciplinary Board of the Supreme Court that the respondent be publicly reprimanded for his conduct and violations of the Code of Professional Responsibility and that he be required to pay for the expenses of the formal disciplinary proceeding."

As we have previously indicated, Amundson took exception to some, but not all, of the findings, conclusions, and recommendations of the Disciplinary Board. Amundson's specific exceptions are as follows:

"I.

"This respondent's action in the drafting of decedent's last will and testament was done with the full knowledge and approval of the decedent and her husband.

"II.

"Respondent's action in witnessing the will was done in the same open and fully disclosed manner so that there would be no covert and hidden action of his part in the drafting and execution of the last will and testament.

"III.

"Respondent, in encouraging the decedent to go to another lawyer for the purpose of drafting her last will and testament, would have been guilty of misconduct by circumventing a disciplinary

rule through actions of another. If respondent was guilty of misconduct in drafting her last will and testament, he would have been guilty of a greater act of misconduct by encouraging her to go to another lawyer knowing that all of her estate–or a greater portion of it–would be willed to him.

"IV.

"Respondent used no fraud, coercion or undue influence on the decedent. Her wish that respondent have the farm and all of the couple's property was her own original desire, thought and intention."

Amundson's objections to the conclusions of the Disciplinary Board are, by their own terms, limited to the facts surrounding the preparation and execution of Margit's will. Amundson does not take issue with the findings and conclusions of the Disciplinary Board concerning his actions subsequent to Margit's death although those facts are, as we shall discuss later, significant to our disposition of this matter.

The three–member panel concluded that Amundson's drafting and witnessing of a will in which he was named as executor and as a beneficiary violated the provisions of Canon 5 of the Code of Professional Responsibility[1] and Disciplinary Rules 5–102 and 5–103.[2]

DR 5–102 and DR 5–103 have a connection with the factual situation before us, but EC 5–6, also cited by the panel in its conclusions and recommendations, is more directly involved. It provides:

"A lawyer should not consciously influence a client to name him as executor, trustee, or lawyer in an instrument. In those cases where a client wishes to name his lawyer as such, care should be taken by the lawyer to avoid even the appearance of impropriety."

The facts before us do not indicate that Amundson consciously influenced either Nelius or Margit to name his as executor, lawyer, or beneficiary in the will. The Nelsons and Amundson had a close personal relationship, akin to that of parents and child, which had existed from Amundson's early youth. That fact, plus the facts that the Nelsons had no children of their own, had no close relatives living in the vicinity, and had relied upon Amundson for personal and social assistance as well as legal assistance, clearly indicate that Amundson is the person they would choose as executor of the will. Canon 5 does not specifically prohibit a lawyer from being named as executor or lawyer in a will but it does require the lawyer to avoid any appearance of impro-

---

1. Canon 5 of the Code of Professional Responsibility states:
   "A LAWYER SHOULD EXERCISE INDEPENDENT PROFESSIONAL JUDGMENT ON BEHALF OF A CLIENT."

2. These Disciplinary Rules provide:
   "DR 5–102 *Withdrawal as Counsel When the Lawyer Becomes a Witness.*
   "(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).
   "(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."
   "DR 5–103 *Avoiding Acquisition of Interest in Litigation.*
   "(A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:
   "(1) Acquire a lien granted by law to secure his fee or expenses.
   "(2) Contract with a client for a reasonable contingent fee in a civil case.
   (B) While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

priety.[3] Considering the factual situation with which we are concerned, we find no appearance of impropriety in Amundson's drafting of the will in which he was named as executor. Because it was possible, although not probable, that the execution of the will would be challenged, it would have been preferable had Amundson and his wife not witnessed Margit's execution of the will. There was, however, a third witness, Thiegs.

Counsel for the Disciplinary Board has pointed to EC 5–5, which was not cited by the hearing panel in its findings, conclusions, and recommendations. We agree that it is more pertinent to the factual situation before us. It provides:

"A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or over–reached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. *Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.*" [Emphasis supplied.]

Counsel for the Disciplinary Board also notes that in Informal Opinion 1145 issued on November 5, 1970, the Standing Committee on Ethics and Professional Responsibility of the American Bar Association, in response to the question of whether or not a lawyer may prepare a will for his spouse naming the lawyer as beneficiary, stated:

"From these case authorities and cited ethical authorities, we distill the general rule of professional responsibility that the existence of a marital relationship between the lawyer–beneficiary and the testator would not of itself disqualify the lawyer as a draftsman of the will. Nevertheless, a lawyer in some cases is vulnerable to later accusation of impending impropriety. If he has any doubt that there are supporting facts in the surrounding circumstances buttressing such an accusation, he should advise the selection of independent counsel. The quantity of such corroborating evidence is related to the amount of the legacy, the origin of such legacy, the source of the suggestion for the amount of the legacy, its disparity with those accorded others, and the nature of relationship of the lawyer with those other beneficiaries. Manifestly, a lack of parental relationship with such persons would be a circumstance worthy of note."

The disciplinary cases involving a lawyer drafting a will in which he is named as a beneficiary arrive at no single consensus.[4] In the earlier cases there appeared to be somewhat less concern about this matter than appears in later case decisions. Thus in *Nebraska State Bar Association v. Richards*, 165 Neb. 80, 84 N.W.2d 137 (1957), the Nebraska Supreme Court stated:

"We do not think respondent was guilty of unethical conduct merely because he drafted a client's will containing a provision therein whereby he became a beneficiary of a part of her estate when, as the record here shows, she insisted he do so. [Citations omitted.] Attorneys for clients who wish to leave them or their families a bequest or devise or part of their property, which they have a perfect right to do, will do well to have the will drawn by some other lawyer. But if a client insists on having his or her attorney draft a will containing such a provision we can see no reason why the attorney should refuse to do so and thereby defeat his client's wishes. However, when such is the case the attorney's responsibilities to the heirs at law are much

---

**3.** See 57 A.L.R.3d 703 (1974) for annotation on disciplinary proceeding based upon attorney's naming of himself or associate as executor or attorney for executor in will drafted by him.

**4.** For annotation of this subject see 98 A.L.R.2d 1234 (1964).

greater and, become increasingly so, when he is also named in such will as the executor thereof and later acts as attorney in relation to the probate thereof." 165 Neb. at 94, 84 N.W.2d at 146.

In *State v. Horan*, 21 Wis.2d 66, 123 N.W.2d 488 (1963), the Wisconsin Supreme Court in a disciplinary proceeding discussed the situation with which lawyers are confronted in drawing a will for a friend or a relative who wishes to make a bequest to the attorney or to a member of the attorney's family. The court pointed out the dangers of such action because of conflict of interests, the incompetency of an attorney beneficiary to testify because of a transaction with the deceased, the possible jeopardy of the will if its admission to probate is contested, the possible harm done to other beneficiaries, and the undermining of the public trust and confidence in the integrity of the legal profession, and concluded:

"We do not mean to state that a lawyer may never draw a will for a personal friend or members of his family or close relatives in which he or a member of his family is a beneficiary. A lawyer may draft a will for his wife, his children, or his parents, or other close relatives, in which he is a beneficiary and stands in the relationship to the testator as one being the natural object of the testator's bounty. In such a case if the proposed legacy to himself or a member of his family is reasonable and natural under the circumstances or no more than would be received by law and no reasonable grounds in fact exist for the attorney to anticipate a contest or for the public to have reasonable cause to lose confidence in the integrity of the bar, such will may be drawn. The mere existence of a confidential relationship between the testator and his lawyer who is a beneficiary under the will does not *per se* raise the inference of undue influence. *Will of Faulks*, *supra* [246 Wis. 319, 17 N.W.2d 423 (1945)]. However, if the attorney acted as draftsman of the will and there are any circumstances either because of preferential treatment in relationship to others or if the bequest is more than a token

or modest bequest from a personal friend or the attorney suggested the bequest to himself or to a member of his family, or any other somewhat persuasive circumstances, the inference arises and would reasonably lead the public to question the integrity of the lawyer. Ordinarily a lawyer should not draw a will under circumstances which give rise to the inference of undue influence. He should draw a will in these circumstances only after fully advising his client of the effect thereof and when he is justified in believing that there is or will be independent competent evidence which rebuts the inference." 123 N.W.2d at 492.

In *State v. Collentine*, 39 Wis.2d 325, 159 N.W.2d 50 (1968), the Wisconsin Supreme Court, in another disciplinary proceeding, discussed *Horan* and concluded that the attorney may, if relying upon the language of *Horan* and ignoring its spirit, conclude he could draft a will in which he was named as a beneficiary. The Wisconsin court then laid down a more specific prospective rule, stating:

"In order to prevent future misunderstandings, we conclude and establish as a rule for prospective application that a lawyer may be the scrivener of a will in which he is a beneficiary only when he stands in relationship to the testator as the natural object of the testator's bounty and where under the will he receives no more than would be received by law in the absence of a will. Under any other circumstances in which the lawyer-draftsman is a beneficiary, this court will conclude that the preparation of such a will constitutes unprofessional conduct.

"When a testator wishes to have his attorney draft a will in which that attorney is entitled to anything more than he would be at law, it is the absolute duty of the attorney to refuse to act. He has the responsibility of advising his client to consult another attorney if he wishes to pursue such a bequest." 159 N.W.2d at 53.

In *Matter of Gonyo*, 73 Wis.2d 624, 245 N.W.2d 893 (1974), the Wisconsin Supreme Court, relying upon *Collentine*, concluded

without discussion that an attorney who drafted a last will and testament for a client in which the attorney was named as the residuary legatee deserved a reprimand.

In *In re Conduct of Jones*, 254 Or. 617, 618, 462 P.2d 680, 680 (1969), the Oregon court stated:

"Any lawyer should know, without being told, that when a client wants to make a testamentary provision for the benefit of the lawyer, that lawyer should withdraw from any participation in the preparation or execution of the will. Poor judgment does not excuse such an inflexible rule."

In *Columbus Bar Association v. Ramey*, 32 Ohio St.2d 91, 290 N.E.2d 831 (1972), the Supreme Court of Ohio determined that an attorney's conduct in preparing a trust and will, through which he stood to inherit all the testatrix's property, violated Ethical Consideration 5–5. The Ohio court found the circumstances to be the opposite from those which would fall into the category of the exceptional circumstances provided in EC 5–5.[5]

The changing attitude of the courts may be summarized by the statement of the Iowa Supreme Court in *Committee on Prof. Ethics v. Behnke*, 276 N.W.2d 838 (Iowa 1979), in addressing the question of whether or not the drafting of a will in which the drafting attorney is named as a contingent beneficiary is unethical and a violation of EC 5–5:

"Respondent on this issue ignores EC 5–5 and asserts, 'The general view prior to the adoption of the present DR 5

101(B) was that although it was not a preferable practice the drawing of a will for a client in which the attorney is named as a beneficiary was not prohibited.' The cases do not support this statement. [Citations omitted.]

"The language in the opinions relied on by respondent is antiquated. None of the authorities respondent cites were involved with a rule like EC 5–5. The bench and bar are increasingly sensitive to the appearance of impropriety inherent in these situations. Ethical consideration 5 5 as it appeared at the time of these events was fashioned to steer lawyers away from such danger areas.

"A violation of EC 5–5—part of our ethical code— would be unethical conduct. Defendant does not dispute he was beneficially named in the will, even though he was a contingent beneficiary." 276 N.W.2d at 844.[6]

In this instance the will was drafted and executed in October 1963. At that time EC 5 5 was not a part of the American Bar Association Code.

At oral argument, counsel for the Disciplinary Board conceded that the part of the Board's conclusion No. 4, i. e., that Amundson's actions in drafting the will violated the provisions of Canon 5, DR 5 102, DR 5 103, and EC 5 6, may be incorrect insofar as those provisions were not part of our statutes and rules in 1963 when Amundson drafted the will. Although counsel for the Disciplinary Board stated he believed the drafting of the will by Amundson was im-

---

5. The Ohio court stated:

"By respondent's own testimony, Miss Sheppard is pictured as a distressed, confused woman, living in fear of being recommitted to a state institution and trusting few, if any, people. Her relationship with respondent arose from respondent's prior association with Poppleton, a man whom she had trusted explicitly and who had secured her release from a state institution. She had seen respondent on only one prior occasion, and had not established such a relationship with him as would cause one to expect her to designate him as remainderman of her entire estate." 32 Ohio St.2d 91, 98, 290 N.E.2d 831, 836 (1972).

6. Subsequent to the events involved in *Behnke*, the last sentence of EC 5 5 of the Iowa Code of Professional Responsibility, which was identical to the last sentence of our current EC 5–5, was amended to transfer the substance to new Disciplinary Rule 5–101(B) to read:

"A lawyer or the lawyer's partners or associates shall not prepare an instrument in which a client desires to name the lawyer beneficially unless the lawyer is the spouse of, or is the son in law or daughter in law of, or is otherwise related by consanguinity or affinity, within the third degree, to the client."

proper at that time, he also conceded the statutes and regulations then in effect were more general and not so specific as our current provisions. He refers us to Section 27–14–02, N.D.C.C., which was in effect in 1963, setting forth the causes for suspension or revocation of a certificate of admission to the Bar of North Dakota. Subsection 7 of that section permits a certificate of admission to be revoked or suspended by this court if the attorney has committed any act which tends to bring reproach upon the legal profession. That subsection also provides that the enumeration of certain grounds for disbarment or suspension of attorneys at law shall not be deemed a limitation upon the general powers of the Supreme Court to suspend or disbar for professional misconduct.

■ We cannot, therefore, apply current specific provisions to an act that took place prior to the time those provisions became a part of our Code of Professional Responsibility; nor have we found any disciplinary proceedings reported by this court in which this precise question has been previously presented. We do note the statement of this court in an action contesting a will drafted by an attorney who was named therein as a beneficiary:

"Few challenges to the validity of wills on the ground of undue influence have reached this court. We have never considered whether a presumption of undue influence arises from the fact that an attorney draws a will under which he takes a substantial benefit. We have no statutory presumption applicable to this situation. Our careful study of the cases and texts dealing with this question leads us to the conclusion that we should not by judicial precedent establish a rule that a presumption of undue influence invariably arises from the fact that a will is

drawn for a client by an attorney who becomes a major beneficiary under the will. The conditions under which such wills might be drawn could conceivably differ so greatly that such a presumption in one case would serve the ends of justice but in another would be an impelling force in the creation of injustice." *Stormon v. Weiss*, 65 N.W.2d 475, 517 (N.D. 1954).[7]

■ A review of the factual situation involved in this instance reveals, in addition to the facts already discussed, that at the time Margit wanted Amundson to draft the will and include him as a beneficiary he advised against it. Other beneficiaries were named in the will at Amundson's suggestion. The first draft of the will did not include Amundson as a beneficiary and Margit would not execute it because she wanted Amundson named as a beneficiary. Margit insisted Amundson share in the estate. The Nelsons were advised it was unusual for a lawyer to draw a will, to be the executor, and to be a beneficiary in the will, and were advised to go to another attorney in Bowman, but the Nelsons refused to do so and continued to insist that Amundson draft the will. Amundson testified that after Margit insisted he draft the will and include himself as a beneficiary therein he determined it would be better to do it openly rather than covertly by having another attorney draft the will. Although Amundson's open and candid approach has merit, he misconceives the purpose of insisting the client see another attorney. The purpose is that the client have independent advice and counsel. If, after receiving that independent advice and counsel, the testator remains steadfast in the desire to name the attorney as a beneficiary in the will, there should be little doubt that the will expresses the intent of the testator. Such a procedure not only is to the benefit of the client

---

7. In *Matter of Estate of Wagner*, 265 N.W.2d 459 (N.D.1978), this court reaffirmed that portion of the *Stormon* decision quoted above. Our previous holding that there is no presumption of undue influence in those situations in which an attorney drafts a will and is named therein as a beneficiary does not indicate our approval of that procedure. Our previous hold-

ing does, however, mean that such a will is not presumptively invalid. If the will were presumptively invalid because the attorney who drafted it was also named therein as a beneficiary, additional ethical concerns might be involved. See 19 A.L.R.3d 575 (1968), "Wills: Undue Influence In Gift to Testator's Attorney."

but will avoid the appearance of professional impropriety and promote public confidence in our legal system and the legal profession as required by Canon 9, Code of Professional Responsibility.

On the basis of these particular facts we cannot conclude there is clear and convincing evidence that Amundson was guilty of a violation of the provisions of Section 27 14 02(7), N.D.C.C., in 1963 when the will was drafted. Because of the unusual relationship [8] between the Nelsons and Amundson and because that relationship was established long before Amundson became an attorney, we doubt many people who knew these individuals would have thought it odd that Amundson drafted the will, was named as executor, and was one of the named beneficiaries therein. We hasten to add that we recommend attorneys do not draft wills in which they are named as beneficiary. We do not adopt the strict position of the Wisconsin court in *State v. Collentine, supra,* but in the future attorneys will have difficulty in convincing us of the "unusual circumstances" which justify their drafting a will in which they are named as a beneficiary. As stated by the court in *Behnke, supra* :

> "We cannot find anything exceptional in the above circumstances. Lawyers involved in probate and estate planning often observe the syndrome evidenced here; the frustration and vacillation of

wealthy and childless old persons without close family ties. The resulting vulnerability only enhances the EC 5–5 requirement. Another lawyer selected by the client should draft the instrument which beneficially names the client's lawyer." 276 N.W.2d at 846.

Although we have concluded Amundson did not, under these exceptional circumstances, violate the provisions of Canon 5 of the Code of Professional Responsibility, DR 5-102, DR 5 103, EC 5–5, EC 5–6, nor Section 27 14 02(7), N.D.C.C., our review does not end there. The hearing panel has also found that Amundson failed to communicate with the beneficiaries of the estate as to their status as beneficiaries and as to the status of the estate itself, in violation of the provisions of Canon 1,[9] DR 1-102(A)(1), (5), and (6),[10] Canon 6,[11] and DR 6-101(A)(3).[12]

The hearing panel has also determined that Amundson was negligent in representing Margit's estate by his failure to complete the estate tax returns in a timely manner and thereby incurring interest; by his failure to distribute the assets to the beneficiaries; and by his failure to take any significant action toward completion of the probate of the estate since 1975, in violation of the provisions of Canon 1, DR 1-102(A)(1), (5), and (6), Canon 6, DR 6-101(A)(3), Canon 7,[13] and DR 7-101(A)(1), (2), and (3).[14]

---

8. The hearing panel did not ignore this relationship but rather indicated that it took cognizance thereof and that it was considered by the panel in mitigation.

9. Canon 1 of the Code of Professional Responsibility states:
   "A LAWYER SHOULD ASSIST IN MAINTAINING THE INTEGRITY AND COMPETENCE OF THE LEGAL PROFESSION."

10. DR 1–102 provides:
   "(A) A lawyer shall not:
   "(1) Violate a Disciplinary Rule.
   "(2) . . .
   "(3) . . .
   "(4) . . .
   "(5) Engage in conduct that is prejudicial to the administration of justice.
   "(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

11. Canon 6 reads:
   "A LAWYER SHOULD REPRESENT A CLIENT COMPETENTLY."

12. DR 6 101(A)(3) provides that a lawyer shall not:
   "(3) Neglect a legal matter entrusted to him."

13. Canon 7 states:
   "A LAWYER SHOULD REPRESENT A CLIENT ZEALOUSLY WITHIN THE BOUNDS OF THE LAW."

14. DR 7 101(A)(1), (2), and (3) provides that a lawyer shall not intentionally:
   "(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule,

■ There was testimony from Amundson's wife, Helen, as to the serious illnesses which beset members and friends of the immediate family, including Helen, the deaths of several relatives and close friends and the difficulty Amundson had in securing adequate secretarial help during the period Helen was ill. Amundson did not excuse his actions on these grounds at the hearing before the panel nor did he file any exceptions to the findings of the hearing panel concerning these matters. At oral argument before us Amundson did, however, state that in retrospect he now realizes these illnesses of immediate members of the family as well as the illnesses and deaths of other close relatives and friends were the cause of his inattention to the probate of Margit's estate. But a heavy workload, in itself, or taken in conjunction with the fact that Amundson was beset by personal problems, does not justify a failure to attend to the matters which have been entrusted to the attorney's care. *In re Fraser*, 83 Wash.2d 884, 523 P.2d 921 (1974). Even personal illness does not shield an attorney from his professional responsibility. *State ex rel. Oklahoma Bar Ass'n v. Fore*, 562 P.2d 511 (Okl.1977).

■ We have reviewed the record de novo [*Matter of Lovell, supra*] and we conclude the findings of the hearing panel were supported by clear and convincing evidence.

Amundson himself testified that he was not entirely sure as to the reason for his failure to communicate with the other beneficiaries and complete the probate of the estate promptly. He also testified:

"And I also realize now that there was a conflict between what I should have done

under her instructions and what I did do, more or less imposing my will on her so that all these assets weren't mine. I didn't need them; I didn't want them. I was willing to take that share, but this is what it amounts to. This is the only thing I can say, that there was a mental block there that I could not overcome. And I realize now that I should have gotten a lawyer and had him act as the attorney of the estate and let him take care of the probate." [15]

Amundson's statement is indicative of the very reason an attorney should not draft a will in which he is named as a beneficiary. It may also be an indication that, although Amundson believed he was justified in drafting a will in which he was named as executor and a beneficiary, he was in a very uncomfortable position when the time came to actually reveal the will and submit it for probate. Thus, although we have concluded the facts do not reveal any wrongdoing by Amundson in drafting the will in 1963, it appears his actions in so doing have a direct bearing on his failure to act promptly to notify the other beneficiaries and complete the probate of Margit's estate after her death. Amundson should have been entirely forthright in contacting the beneficiaries and informing them of the contents of the will, completing the probate, and making distribution of the assets. Had Amundson acted promptly after Margit's death to notify the beneficiaries and complete the probate of the estate it seems probable that there would have been no suspicion concerning his action in drafting the will. Because of the circumstances his failure to do so cast severe suspicion upon all his actions, including the drafting of the will. Public trust in

---

however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

"(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

"(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B)."

15. In response to the question "Is my understanding of your statement correct, then? You believe that the assets of the estate, had they gone as she really wished, they would have gone to yourself?" Amundson replied: "There would have been a joint tenancy proceeding and nothing else, yes, sir."

the legal profession is a necessity and as a consequence lawyers traditionally have been held to a higher standard. *Matter of Jaynes,* 267 N.W.2d 782 (N.D.1978).

Because of Amundson's conduct subsequent to Margit's death, we conclude there is a basis for the issuance of a reprimand to him. The recommendation of the Disciplinary Board was for a public reprimand. That recommendation was based on a conclusion Amundson had acted improperly in the drafting of the will as well as the conclusion that Amundson acted improperly in the handling of the probate of Margit's will subsequent to her death. As we have previously stated, we do not believe Amundson's conduct in the drafting of the will was improper. We do agree that Amundson's handling of the probate was not proper.

It is, of course, not possible for this court to issue a private reprimand. Private reprimands are issued by the Disciplinary Board, not this court, although we may review the decision of the Disciplinary Board to issue a private reprimand. Rule 10(k), N.D.R.D.P. Therefore, this opinion will serve as the reprimand to Mr. Amundson.

We were informed at oral argument that the probate of the estate of Margit Nelson has been completed and that the assets have been distributed to the beneficiaries. Therefore, an order requiring completion of the probate proceedings is not necessary.

It is ordered that Amundson pay for the costs of the disciplinary proceedings, which amount is to be determined by the Disciplinary Board or its designated officer or agent, and that Amundson submit to the Clerk of the Supreme Court evidence of such payment within 30 days of the filing of this opinion.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.