(No. 56126.—

*In re* JOHN OTTO VOGEL, Attorney, Respondent.

*Opinion filed September 17, 1982.*

MORAN, J., took no part.

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

John O. Vogel, of West Chicago, *pro se.*

JUSTICE UNDERWOOD delivered the opinion of the court:

Pursuant to our rules establishing the Attorney Registration and Disciplinary Commission (73 Ill. 2d Rules 751 through 771), its administrator filed a complaint against respondent, John Otto Vogel. The complaint alleged that respondent had represented Arthur Hardisty from 1964 to 1976, and that during those years respondent was guilty of overreaching his client in violation of DR 5—101(A) of the Illinois Code of Professional Responsibility (Illinois State Bar Association 1970). The Hearing Board agreed and recommended three months' suspension from the practice of law. The Review Board, however, found the complaint should be dismissed. We subsequently allowed the Administrator's motion to be permitted to file in this court exceptions to the Review Board's report. 73 Ill. 2d R. 753(e).

The evidence established that respondent first became acquainted with Arthur Hardisty and his wife, Agnes, in 1964 when respondent had successfully represented Agnes in a criminal matter. In 1965 respondent drafted wills for both Hardistys, neither of whom included him as a beneficiary. Those wills apparently left nothing to any of the three Hardisty children, one of whom does not appear to have been acknowledged by Arthur. Agnes died in 1967. On September 4, 1968, respondent wrote Arthur Hardisty giving him respondent's new office address and telephone number and indicating a desire to meet him for lunch and discuss an addition to his will. They met shortly thereafter. Respondent testified that he and Russell Swanson, a Hardisty family

friend, had been trying to effect a reconciliation between Arthur and his family, and that respondent had suggested Arthur leave something to the family in his will. The sons and Arthur did not have a good relationship, and respondent testified that he had understood that, because Agnes had owned a bar or been a bartender, Arthur's sons looked down on her and had not been in Arthur's house after their marriage. At the luncheon meeting Arthur gave respondent a memorandum prepared by Arthur, telling respondent, "That's what I want you to do." The handwritten memorandum provided, "you are to take ten thousand for *yourself*," and gave other directions, including "seeing that Christmas blanks [*sic*] are put on our graves for five years" and putting the pets to sleep. A postscript following the signature stated "you are to look after my afairs [*sic*] now and bill me later."

Respondent further testified that he told Arthur that, since respondent was a beneficiary, he could not prepare the will and would have to get another lawyer to do so. Subsequently a will and a trust instrument were drafted by Fredrick Henzi, a lawyer with whom respondent shared office space. Respondent testified that he made no suggestions to Arthur or Henzi regarding himself, but "had a pretty good idea" what was going into the will and trust. The trust, as executed on September 17, 1968, named attorney Henzi and the Gary-Wheaton bank as trustees. It was designated by the bank as trust No. 950, and its total corpus consisted of $10. Upon Arthur's death the pets were to be disposed of by respondent; a son, Albert, was to be paid up to $5,000 for work performed by him as indicated by a record, the location of which had been disclosed to respondent; and other directions similar to those in the original memorandum were given. The residue was to be divided equally between Russell Swanson and respondent.

The executed will, including funeral instructions, was left with respondent to be delivered by him to the executor. It specifically disinherited the children, appointed Russell Swanson as executor and respondent as his successor, directed that attorney Henzi be employed by the executor, provided for the payment of certain expenses, and devised and bequeathed the remainder of the property to the trustees to be handled as therein provided.

Respondent further testified that he managed, under what appears to have been a very informal arrangement, Arthur's residence property, which included several rental units. His compensation apparently was 10% of the rental collected by him. Respondent had on at least one occasion attempted to arrange a sale of this property for $100,000 with the objective of moving Arthur to West Virginia or Virginia, where he talked of having relatives. This idea was apparently prompted by the fact that Arthur was on one occasion, respondent said, found lying in the snow after drinking too much wine.

In 1973 respondent prepared for Arthur a will naming respondent executor and Russell Swanson successor, a reversal of their roles under the 1968 will. It was never executed. About the same time, respondent testified, Arthur became unhappy with Russell Swanson because of a drinking problem the latter was thought to have, and marital difficulties which had developed between the Swansons. Arthur, respondent said, wanted to change the terms of the trust and requested him to draft the changes. As executed, the amendment eliminated Albert Hardisty as a beneficiary, added $5,000 for Nancy Schramm, respondent's secretary, and substituted a $5,000 gift to Russell Swanson for the 50% of the residue originally given him; respondent became the sole residuary beneficiary. Respondent testified he had discussed with Arthur ''in general'' why he, as a beneficiary, should not draft the amendments and that

Arthur should go to attorney Henzi, but Arthur had not wanted to do so. At that time respondent and Henzi were partners. After Arthur had executed the amendments respondent sent them to the trustee bank, which, he testified, thereafter lost them.

In 1974 a will prepared by attorney Gordon Bunge was executed by Arthur. It provided that, after payment of expenses the entire estate was to be equally divided among Russell Swanson, Jeanne L. Swanson, Albert Hardisty, Sr. (a son), and respondent and appointed the son executor with Jeanne Swanson as his successor. Respondent knew nothing of the execution of this will until June 1976, when Arthur told him he had destroyed this will by cutting it up with scissors.

On May 27, 1976, respondent testified, Jeanne Swanson brought Arthur to respondent's office. Arthur said he wanted to put the residence real estate in the trust. When respondent asked "why" he was told by Arthur that it was none of his business. Respondent did not tell Arthur he should consult independent counsel, and, because Fredrick Henzi was now a judge, respondent prepared and Arthur executed a deed conveying the property to the trust, together with an amendment of the trust terms. Besides updating the pet and cash provisions the amendment deleted from the trust all reference to former attorney Henzi and transferred the real estate to the trust.

On June 3, 1976, Arthur executed a will prepared by respondent which specifically disinherited the children, appointed respondent executor and Russell Swanson successor executor, directed that Carl Kuhn serve as attorney for the executor, indicated funeral instructions were in respondent's possession and that the pets were to be delivered to him, and gave all the residue to trust No. 950.

At the time of execution of this will, respondent

stated that Arthur Hardisty was 84 years of age, suffering from a slight stroke, incontinent and using a urine bag, was in and out of the hospital, used a cane and "was going downhill" physically. Respondent testified that on June 3, 1976, he had a date with Arthur to take him grocery shopping and do some personal business, including paying his real estate taxes. When they finished, Arthur asked respondent to come to his home and look over some things, and there showed him the 1968 will. Respondent suggested deleting attorney Henzi's name. Arthur suggested substituting Carl Kuhn's name, and respondent called Mr. Kuhn, who agreed to serve as attorney for the executor but indicated in response to respondent's question whether "he was available for us to drop in and get a will executed" that he could not take care of it before the following day. Because Arthur wanted it done then, respondent testified, respondent called his secretary from the Hardisty home and told her to "pull out the copy of Mr. Hardisty's will and retype it substituting Mr. Kuhn's name for Fred Henzi's" as attorney for the executor. Shortly thereafter respondent and Arthur went to respondent's office, and the will was executed with employees of the insurance company which had purchased the office building from respondent serving as witnesses.

Respondent also testified that he became executor because in typing the 1976 will his secretary had mistakenly copied the unexecuted 1973 version rather than the 1968 will which respondent had intended. He had not noticed this and thought Russell Swanson was still executor as the 1968 will provided, instead of respondent, as provided in the unexecuted 1973 draft.

The trustee bank wrote respondent on June 16 informing him it did not have the 1973 amendment to trust No. 950, and suggested it be reexecuted. Respondent apparently knew of this earlier, since he testified

that he had upbraided the bank personnel regarding the amendment's loss, the net result of which was to substantially reduce respondent's share of the estate. He also testified that his secretary, upon receiving the bank letter, redrafted the amendment, but that he never told Arthur that the bank had lost the amendment and the new draft was never executed.

Arthur died on June 21, 1976, and letters of administration were issued to a son, Albert; they were later revoked when the will was admitted to probate and respondent appointed executor. Suits were subsequently filed by Arthur's heirs contesting the validity of the trust and of the will. That litigation was ultimately settled in 1979 pursuant to an agreement which gave Milton Hardisty, a son, and Quinton Hardisty, Agnes' son, $1,000 each, and gave the real estate, valued at $120,000, to Albert in return for payment by him of $60,000 to be equally divided between respondent and Russell Swanson. The balance of the estate was to be divided one-half to the heirs and one-fourth each to respondent and Russell Swanson.

Russell Swanson testified at the disciplinary hearing that he had been a friend of Arthur Hardisty since before his marriage to Agnes and was Arthur's "handyman." He had urged the couple to make wills. Arthur "ran hot and cold on people," but usually regarded the witness and respondent as his friends. Arthur and Agnes had a very poor relationship with Albert, Milton and Quinton, and both spoke of the sons in profane terms. None of the family came to Arthur's wake or funeral, although Albert "cleaned out" the house the day his father was taken to the funeral home. The witness learned of the 1974 will, but testified he knew nothing of the circumstances, although he thought his wife had taken Arthur to attorney Bunge's office, where she, too, had a will drawn. The witness also testified that Arthur was

"a very alert individual for an old fellow," but became increasingly dependent on others during the last six months of his life.

We pause here to note that the reports of the hearing panel and the Review Board in this case appear to indicate a belief by their members that respondent was the sole residuary beneficiary of Arthur's estate under the terms of the will and the trust. The record, however, indicates he was not, since the 1973 amendment to the trust which eliminated Russell Swanson as a residuary beneficiary was lost by the bank. No new amendment was executed, and respondent's testimony seems to indicate an acceptance by him of the ineffectiveness of the 1973 amendment.

At the time of the conduct with which we are principally concerned, canons of professional conduct had been adopted by the Illinois State Bar Association Board of Governors on May 1, 1970. Included therein was DR 5—101(A), which respondent is accused of breaching, and which was subsequently adopted verbatim as our Rule 5—101(a). It provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." 79 Ill. 2d R. 5—101(a).

There is no doubt, of course, that drafting a will in which he is to be named a substantial beneficiary is employment embraced within the quoted language. As we said in *In re Barrick* (1981), 87 Ill. 2d 233, 238: "[W]hen an attorney drafts a will naming himself as a beneficiary, the potential for abuse in the clash of roles is serious enough that the attorney must be deemed to suffer from a conflict of interest." While as long ago as the days of the Roman emperors one who drafted a will could not name himself as beneficiary (*In re Blake's Will* (1956), 21 N.J.

50, 120 A.2d 745), most of the modern cases and ethical canons do not contain such a flat prohibition (Annot., 98 A.L.R.2d 1234 (1964)); there are, however, exceptions. (See, *e.g., In re Gonyo* (1976), 73 Wis. 2d 624, 245 N.W.2d 893; *State v. Collentine* (1968), 39 Wis. 2d 325, 159 N.W.2d 50.) Among the reasons for including such action, absent exempting circumstances, within the definitions of unprofessional conduct subjecting the doer to disciplinary action are that it may well involve a disservice to the client for it involves the attorney in a conflict of interests, may affect his competency to testify, jeopardizes the will if a contest ensues, thus harming other beneficiaries and possibly nullifying the testator's intended distribution of his estate, and diminishes confidence in the integrity of the legal profession. *Barrick;* Annot., 19 A.L.R.3d 575 (1968); Annot., 98 A.L.R.2d 1234 (1964); *Disciplinary Board v. Amundson* (N.D. 1980), 297 N.W.2d 433; *State v. Horan* (1963), 21 Wis. 2d 66, 123 N.W.2d 488.

It is, of course, apparent from our opinions that this court has consistently disfavored the actions of attorneys who prepare for clients documents in which the lawyer is a beneficiary. (*Barrick; In re Saladino* (1978), 71 Ill. 2d 263; *In re Anderson* (1972), 52 Ill. 2d 202; *Dial v. Welker* (1927), 328 Ill. 56.) It is equally clear that in those cases we have not considered such action sufficient *per se* to warrant discipline. (*Barrick.*) As we there indicated, in special circumstances such as existed in that case, such action may not be improper, and we held that since the respondent there had made a full disclosure to the client of the ethical considerations involved and urged her "until she would hear no more about it" to employ other counsel (*In re Barrick* (1981), 87 Ill. 2d 233, 241), the disciplinary complaint should be dismissed.

There are, however, significant differences between that case and this. Respondent here drafted instruments which would have given him the bulk of the estate. Ar-

thur's sons were given nothing. While the testimony established that the father-son relationship was poor, a 1974 will of which Arthur had not informed respondent until two years later included one of the sons and substantially reduced respondent's share of the estate. Too, we do not have here the clear proof of full disclosure to a "sharp" and active client which the record contained in *Barrick.* While respondent testified in general terms that he had suggested employment of other counsel on most of the occasions in question, he did not do so in 1976 when the real estate was conveyed to the trust, and the Review Board's statement that on "all" occasions respondent had suggested the employment of other counsel is in error. Respondent's testimony on this point was that he regarded the deed as unnecessary since respondent's will devised the real estate to the trust. While it is correct that the 1968 will so provided, it had apparently been revoked by the 1974 will. Too, the 1976 will, drawn a week after the deed, was challenged by the sons and might have been overturned in a trial on the merits. We do not agree that the deed was inconsequential.

We believe, as found by the hearing panel, that it has been established by clear and convincing evidence that respondent violated DR 5—101(A). On at least one occasion in 1976 he accepted employment without any suggestion to his client of the problems involved and the desirability of securing independent counsel, and the quality and extent of the disclosure on other occasions is questionable. There is, for example, nothing before us to indicate any attempt by respondent to explain to his client the possibility that the will he drafted might be challenged on undue-influence grounds because of his dual role as drafter and beneficiary. This not unusual result occurred, with the consequence that a settlement giving the sons a portion of the estate thwarted Arthur's apparent intent to disinherit them. Nor did respondent, when his client refused other counsel,

make any real effort to protect the documents he drew from subsequent challenges. Instead of using independent witnesses on the 1976 will, as was true in *Barrick,* he used individuals whose credibility might have been successfully attacked because of their acquaintanceship with respondent. In view of respondent's clear breach of the Code, we believe dismissal inappropriate.

There are, however, mitigating circumstances. Respondent and Russell Swanson were apparently the two persons most concerned with Arthur's welfare and actively assisting him. Given his estrangement from the sons it is not unnatural for Arthur to name respondent and Swanson as beneficiaries in the will and trust. Were there any doubt of the fact that Arthur Hardisty and his sons were estranged, the fact that none of the sons attended either the wake or the funeral would seem to eliminate it. Consequently, there appears no real reason to doubt the testimony that the testator intended to disinherit them, even though the execution of the revoked 1974 will may have encouraged filing of the contests. While respondent does not appear to have made as full a disclosure as the rules contemplate of the potential problems his drafting the documents might pose, his client was a personal friend whose needs, both professional and otherwise, respondent had helped care for over the years and who, we do not doubt, was resistant to respondent's suggestions of other counsel. Apparently, the notion of a bequest to respondent originated with the testator and continued in varying forms for nearly eight years prior to his death. Too, while respondent testified his secretary retyped the lost 1973 amendment which gave him 100% of the residue of the trust, respondent does not appear to have made any effort to have it reexecuted by his client. In fact the testimony indicates respondent did not even inform the client that the amendment had been lost by the bank and was not effective even though respondent apparently knew of its loss some time

prior to receipt of the bank letter notifying him of it. The lack of any effort to secure the reexecution of the amendment coupled with respondent's attempt to persuade Arthur to sell his property and move out of State, which would likely have terminated their relationship, seems to belie the existence of any intent by respondent to abuse his client's confidence.

Considering all of the circumstances, we have concluded that censure is the appropriate sanction.

*Respondent censured.*

JUSTICE MORAN took no part in the consideration or decision of this case.